May it please the Court, my name is David Griggs and I'm here on behalf of the appellant, Ryan Presley. Our position, Your Honor, is that this case should see a jury. Or vice versa. Beg your pardon? Or vice versa. That's correct. The jury should hear this case. The District Court failed to correctly apply the law in the summary judgment standard as well as the legal standards for these Title VII cases. The important thing to emphasize is that the series of events that unfolded in this matter must be looked in their entirety. It is not correct to parse out individual statements or incidents in order to defeat the plaintiff's case. The case unfolded over a period of time that wasn't really very long, but which involved a pattern of Mr. Presley complaining about discrimination and then receiving retaliation for that. It began shortly after he commenced employment. The record reflects all of this. He experienced problems with his initial supervisor, Mr. Don Burge. Mr. Burge told him that he must have come from a bad neighborhood. He related incidents to Mr. Presley that he used words such as jig and boy to refer to people, including African Americans, and couldn't understand why African Americans would find that offensive. He told Mr. Presley, and Mr. Presley is, as the record reflects, a large African American man, that his size and appearance upset people. Mr. Presley filed a union grievance about Mr. Burge's treatment on June 1st. That grievance was denied on June 1st. It wasn't even really looked into. However, there was at the same time a Human Rights Committee formed. The union denied it, right? Correct. They didn't think there was a problem there? The union denied the grievance. Mr. Burge also signed the denial. But there was a Human Rights Committee formed. You're not suing the union for breach of the duty of fair representation? No. Not for that. Are you suing them for something else? No. No, I didn't mean to imply that they were. There was a Human Rights Committee formed to look into this issue, and their report is reflected in the record. And they did find that there was disparate treatment of Mr. Presley. And the Human Rights Committee was created by the employer? Yes. It involved some... Right. So how does that help your argument so far? If I could continue, I'll show you how it does. The findings came out months later, after he was first terminated. And that was the first and only case the Human Rights Committee looked into, and then they were disbanded. Disbanded, yeah. Correct. So the Human Rights Committee was not really allowed to function after the Presley case. Shortly after this grievance about Mr. Burge, Mr. Presley had this initial altercation with Mr. Friswald in the workplace. It's well reflected in the record. What is also reflected in the record is there are two very different sides to this story. I would draw the Court's attention to the statement by Rillard Clegg, who was a witness to this. That's... You're right. There were two different versions about the story and about the incident. On one major fact, there didn't seem to be much disagreement, which was that as the incident ended, your client walked away and flipped off the boss of the other, the manager of the other fellow. Mr. Presley was told to leave, and he did walk away. As Ms. Clegg verifies, Mr. Presley cooperated with the directives given to him. He does admit that he flipped off Mr. Bruce Smith, but that he was upset because Mr. Smith had stood there and done nothing. What's an employer supposed to do with that? You have to understand the context, Your Honor. I understand the context. This is common in this environment, this type of communication. This is a truck manufacturing plant. People use harsh words with each other. They argue. They use foul language. That was not the reason he was terminated. It was not for flipping off Mr. Smith. That's for insubordination, wasn't it? That was not insubordination. He did as instructed. What was the grounds given for his first termination? They claim he threatened the supervisor. He was instructed to flip off the supervisor? He was not instructed to flip off the supervisor, Your Honor. He was instructed to leave, and as he was leaving, he did flip him off. But you have to understand, a reasonable juror could find that that was a reasonable reaction to the situation, given that Mr. Smith had watched Mr. Friswald physically threaten Mr. Presley and done nothing about it. And Mr. Presley did not do the same to Mr. Friswald, who was sent home, Mr. Presley. So I think a jury could certainly find that was not an unreasonable reaction by Mr. Presley. It certainly doesn't amount to insubordination. It's a similar situation. It's an otherwise similar situation. Absolutely. Doesn't your client have a history of this kind of insubordinate behavior? It depends on who you believe, and that's exactly the point. Who do you believe? That's the jury's job. Mr. Presley has a history of feeling he is being discriminated against, and for resisting that. That's his position. So when he flipped off the supervisor, he was not refusing to follow the directives. He was leaving. He was showing disrespect for management. For that supervisor, he did disrespect him because he felt he was discriminating against him. That's correct. So if an employee has a chip on his shoulder and sees racism around every corner and follows the orders but does so in a – I'm not saying this is your client, but to follow up on Judge Piazza's question, what's an employer able to do? If the employee walks around with a chip on his shoulder, is confrontational at times, follows the instructions but does so in an arrogant manner or flips off the supervisor, says foul language to him, he's complying. But does the employer not have some ability to control the attitudes and the way in which instructions are carried out? This bleeds in somewhat to wearing the shirt and his T-shirt later on, where he has a provocative T-shirt. What is an employer allowed to do within a work setting to try to defuse racial tensions between the employees? The employer is entitled to govern the workplace in a way that if the employee's complaints are, in fact, unreasonably disruptive, then that would defeat the claim. But that's a question for the fact finder to decide. So if the fact finder were to conclude, as Your Honor suggests, I think that would defeat the claim. But we didn't get there. What we have is conflicting evidence regarding whether or not Mr. Presley engaged in behavior that would preclude his claim. You can't take a single instance of flipping off a supervisor in isolation to conclude that – He gets reinstated after that. He does. He does get reinstated. He does. He's asked to take on a management anger course, which he ultimately does after some – The anger management course came a couple months later after another incident in which he felt he was singled out and instructed to refrain from doing something which he saw Caucasian employees do regularly and not get in trouble for. And that was to use – they have these electric carts that they can use to run materials or run around the plant on. And he felt, again, he was being singled out and told not to do something that he had seen Caucasian employees do and not get in trouble for. Then he's sent to anger management counseling, which we believe was not warranted. In fact, the counselor didn't think it was warranted. It wasn't necessary. So it's a pattern, Your Honor, of Mr. Presley, a large black man, being perceived to be threatening. People saying he's threatening, but other people saying he's not. There's a lot of factual issues about this, and that's why a jury should hear it. Then you get to the last incident that's reflected in the record. The last incident? The T-shirt. When he comes to work with the T-shirt. Yes. The T-shirt. And then the interchange or the exchange that follows in relation to that incident. Yes. And if you look at the record, the T-shirt is the culmination of all this. He goes to the mall and has a T-shirt printed up. And the T-shirt says, More black supervisors, more black managers at this plant. Because he feels every time he goes to his white supervisors and managers, they don't want to hear it. They laugh off some of his complaints. They don't think that he's legitimate. So he wears this T-shirt to work. Now what's interesting is he's, again, one of the basis for his termination is insubordination because he didn't follow the directions with regard to the T-shirt. To cover it up or something. Factually false. He absolutely did comply with it. He put a covering shirt over his T-shirt as directed. He simply asked to take it off and was told no. He didn't then take it off and walk around parading the T-shirt. He did as directed. He tried to reason with them and became very frustrated when the argument became heated. But he didn't commit insubordination once again. Surely Mr. LaRochelle did not like being called a racist. He didn't just call him a racist. He did initially. Well, he ultimately, as he was walking out, he called him an eff-racist. Yes, he did. Afterwards, he initially called him a racist. Well, you must be a racist. Mr. LaRochelle became very agitated. Leapt up out of his desk, Mr. Presley turned to leave. Followed him and provoked him. Why don't you just quit if you don't like it? He's complaining about a racist environment. If you don't like the racist environment, just quit? I don't think the law permits that. So he keeps following him. Mr. Presley then uses the F-word. The F-word is very common in this environment. Do they go to too many movies? Well, perhaps. But this isn't a primary school, Your Honor. This is a trucking plant. I know. That's what I say. In movies, they use it all the time. And then he went to the plant manager and asked him if he could display the shirt, if it was offensive. And the plant manager refused to even talk to him. And he was sent home. And then fired. The bottom line here is these were protected activities. And the very next day, he was fired for them. The very next day. And it's very clear why he was fired. You're not arguing that they couldn't tell him to take the T-shirt off, only that he complied with the order. I don't need to argue that. That is not – there is no – They were protected activities. So, in a sense, you are saying that they were unjustified in telling him to cover it up or take it off. We're not saying that they weren't – well, let me step back. The statement that this plant needs more black managers and more black supervisors is absolutely protected. But if they ask him to cover it up, whether or not that's a reasonable request on their part, I think, is for the fact finder to decide. I don't think it is. Just because they don't like the fact that he's saying that doesn't mean that he – there's no dress code that says you must take off the T-shirt. Now, if they did, in fact, show that it was disruptive, then that would be a different matter. But there's no showing. There's just an assertion. There's no showing. There's a self-serving assertion that it was disruptive. There's no evidence of disruption anywhere in this. The HR guy didn't like it, and the plant manager didn't like it. But that's not disruption. And I see I only have a minute left. I'd like to save that if I may. Okay. We'll hear from this side. Morning, Your Honor. Victor Kish, representing Freightliner. With the Court's permission, can I use the actual words that were used? Of course. As long as you don't wear a T-shirt saying them. I promise that I won't. As a matter of fact, I recommend not wearing a T-shirt to court at all, except maybe under your shirt and tie. Very well. Ryan Presley went up to the director of HR, Human Resources Office, and he called him a fucking – No, he didn't do that. No, he didn't just go up and do that. He didn't go up and walk in the door and call him a fucking racist. No. Don't dramatize it. Let's stick with the facts. I am going to get to that, Your Honor. Well, I know, but you're getting to it backwards. Well, I'm starting with that because he went up to the director of Human Resources Office, and he said, in some insubstance, I want to wear this shirt. The director of HR said no, and then he called him a fucking racist. No, he called him a racist. No, that's not true, Your Honor. The record is he called him a fucking racist as he was leaving his office. The director of HR didn't hear him, followed him outside his office, and Mr. Presley said fucking racist, fucking racist, fucking racist, loud enough to drown out whatever the director of HR was trying to say. That's right. So you're saying the record is that he always used the fucking as a modifier to racist every time he mentioned it in the conversation? With the director of Human Resources, absolutely. That's what the record reflects, and it also reflects. I thought you said that he didn't hear him the first time. No, he goes into the office. He essentially says, I want to wear this T-shirt. The director of HR says no, and then Mr. Presley leaves the office and says fucking racist, and the director of HR follows him out because he wasn't sure if he heard him, and then outside the office he repeats it several times in a voice loud enough to drown out the director of Human Resources, and it's in a work area, and there are a number of people there, and there are cubicles in the area. Now, an employer must be able to fire an employee for doing that, especially an employee who had been suspended two times, fired once, who was working under a last-chance agreement for similar misconduct, who had had a written warning three months earlier, and who also had to enroll in mandatory anger management, and all of that. Let me break it down into its component parts just to make sure I understand. Simply using the word racist, would that be a basis for disciplining somebody? Not necessarily. Not necessarily, Your Honor. I could see a set of facts where he says to the HR director, look, I need to say something kind of blunt to you. I think there are some racists in this workplace. That's how I feel. And if he said something like that, then, you know, that's not violating, that's not disruptive, that's not offensive, that's not argumentative, but that's not what happened, of course. I mean, he didn't like the answer that he got, which was cover it up, take it off, or go home and get another T-shirt, and then he reacted to that, and it's the same pattern of behavior that had happened before. I agree. There was this pattern of anger, of arguing, offensiveness, disruptive, being insubordinate. Okay. That's a very long answer to a yes or no question. So the answer is yes, Your Honor, that there are sets of circumstances where that word could be used. Where is it? I want to just, I'm looking at the district court's opinion. Where is it that it's in the record, at least as found by the district court, about him walking into the office and calling him a racist? It says, Presley denies that La Rochelle, I'm looking at ER 10, Presley denies that La Rochelle told him this, but he does admit that he called La Rochelle a racist and left the office. Outside the office, Presley admits he told La Rochelle, in front of several other employees, that he was a fucking racist, and he kept repeating it. I'm referring to, and I don't have the sight at my fingertips, but the deposition of Ryan Presley. Presley, he concedes as he was walking out of the office that he used that term, and then outside the office he used it several times. I asked him how many times he used it. He said he didn't know, but several times. I said, was it yelling? He denied that it was yelling. I understand that there's no dispute that he did say it outside the office. All right. And what I'm saying, Your Honor, is what didn't happen here is a closed-door meeting in which there was this calm discussion about is there racism in the plant or not. What did happen is an employee losing his temper again because he didn't get the answer that he wanted to get. As I was asking you, so merely using the word racist wouldn't be a basis for discipline? Well, it depends on how it's used in the circumstances, Your Honor. As I'm trying to say, there are some circumstances not present. You don't give me the same long answer. You don't want to really listen to what I'm asking. Simply using the word racist alone is not a basis for discipline, just using the word with nothing else, no yelling, nothing else, just calling somebody a racist. It could be the grounds for discipline, yes. And what circumstances would those be? Well, I could see a whole set of circumstances, a raised voice, a finger pointing. I said not any of those things. Did you hear me? So just in a normal tone of voice, an employee calls the human resources director a racist? That's the question? No, I'm trying to... You're taking a very long time to understand a very simple question. Simply saying somebody is a racist, is that a basis for discipline? Not necessarily. What does necessarily mean? What help do you think you're giving me by adding the word necessarily? Because it... Could the word, using the word racist alone with nothing else, no finger pointing, no yelling, nothing else at all, could that be a basis for discipline? I mean, this is just a simple question. If you don't know the answer to it, let's move on, because I've got lots of other questions, and it looks to me like you just don't want to get to them. No, I do want to get to them. If you don't want to get to them, I won't know what your answer is, and when I go back to confidence and decide the case, I will not know what you have to say about this. My answer... What is your answer to the simple question I've asked? My answer is that... Could it be a basis for discipline, yes or no? Simply saying your supervisor is a racist. Yes. It could be? Yes. Okay. And what circumstance would that be? How do you justify saying somebody can be disciplined simply for saying somebody supervises a racist? Where do you get the justification for that? The justification would be... And I said this a moment ago, and I am trying to answer the question, but feel free to cut me off if I'm not. The justification would be... Answer the question. Why all these... You know, just answer the question. Where the word is used in an insubordinate and angry way, then it would be inappropriate. If it was used in a way, in just a calm tone of voice, which I think is your question, then no, it might not be. So if you think that's my question, why do you answer a different question? Because I think there's more to it, Your Honor. I think the question is asking it in a calm... saying it in a calm voice, just using the term alone. Let's say it's just a letter. It's just a letter. You send it to your supervisor. There's no personal contact at all. He writes a letter and says, I think you're a racist. Okay? And the letter comes in, you know, he politely hands it over, and the supervisor reads it. So there's no personal contact, there's no aura, there's no threatening gestures, nothing. It's just a communication that the subordinate thinks is right. Do you think that's a basis for discipline? No. Okay. Now, is using the word fucking a basis for discipline in this particular workplace? Do people get disciplined on a regular basis for using profane language? No. Okay. So is there something about the combination of fucking and racist that makes the combination of those two words a basis for discipline? Yes. Tell me what. The raising of his voice. No, no, I haven't gotten to that. I will get to it. If you just follow me and listen to what I'm asking and answer the questions I'm actually asking. Is the combination of the two words together a basis for discipline? Is there something on which one can be a discipline? Simply, let's say, once again, we write a letter. He writes a letter. You are a fucking racist. No personal gestures, there's no threat, there's nothing, no one else hears it. Is that a basis for discipline? Come on, you must have thought about this. I thought deeply about it, Your Honor. I thought deeply about it. It's just not the set of facts that are in this case, of course. No kidding. And you are not coming here expecting to be asked hypothetical questions that are different from the facts. No, of course I did. Okay, there we go. So what is the answer to the hypothetical question I am asking? Just using fucking with racist. I think that could be, that is the grounds for discipline. It is. Yes. And what would be the basis of that? You said you don't discipline people. People use, I take it from your answer, that use of the F word in this particular workplace is not something that commonly gets disciplined. Because if fucking racist is put into a letter to a manager, it's disrespectful, the manager has the right to control the work environment, and that's not a respectful way to communicate a message. Okay. So that's your basis. Disrespect of the manager. No. In coming back to our set of facts, the basis was that he was disruptive, offensive, argumentative, insubordinate. Those are all conclusions. Well, three months prior to that... If use of the word after F word in that environment, and we all know environments like that where people use profane language on a regular basis, is not necessarily meant to be offensive. You know, F word can be used in all sorts of jocular ways and all sorts of exclamations of surprise. You know the lingo, right? Yes. If people don't get disciplined for that, it must be something else. It must be something else about this that you think makes it the basis of discipline. I'm having a hard time grasping what it is. In our case, Your Honor, we're talking about somebody who was there a short period of time, who was on a last chance agreement for related misconduct. Just three months earlier, he had gone through the anger management and received a written warning that said, Freightliner will not tolerate any more argumentative, disruptive, or offensive conduct. So this is an employee over a short period of time that's engaged in a pattern of misconduct. Just to make sure I understand, this is a workplace where using strong language with supervisors is always punished. Is always punished? More generally punished. If people sort of say to a supervisor, Hey, fuck you, that's the kind of thing that is not tolerated. I think that's right. I don't know. Is it? Well, I think as Judge King found, it's a tense work environment, it's a rough and tumble work environment, and certainly... But you're not showing that this is the kind of language that's, you know, this is the kind of workplace where we used to think of sailors talking, you know, they talk like what we used to call sailors talk, where rough language is common in the workplace. Yeah. Do you deny that? No, I don't deny that. I think that's correct. However, there's a continuum of how that sort of language is used. Some people use it as part of their vernacular, and other people use it to threat physical violence. And I think an employer has the right to exempt... You think that Mr. Presley here was threatening physical violence? No, I didn't say that. I was just saying that's the continuum upon which swear words could be used. He was on a last chance agreement, and that last chance agreement said no more threats of physical violence. I think he was also on notice, Your Honor, not to engage in continuing... I thought you just said there was no threat of physical violence. That's correct. With respect to the T-shirt incident, there wasn't. With respect to the earlier incident in July 2005 with the co-worker, there was. He was on a last chance agreement when that happened? Pardon me? He was under a last chance agreement when that happened? No, he filed the grievance that went to the Board of Adjustment. You focus, you know, you led your argument with this racist scenario. He was under the last chance agreement. That was for a period of six months at the time of the T-shirt incident. The racist scenario didn't involve threats of violence. It didn't, but as Judge King correctly pointed out, the December 2nd warning tightened up that last chance agreement and said Freightliner will no longer tolerate offensive conduct. Moreover, Your Honor, when somebody is under a last chance agreement, and that was in effect at the time of the T-shirt incident, and it says not to make threats of physical, you know, conduct, I think he's on notice that he's not to engage in offensive and disruptive... Right, he's got to walk a thin line because... Yeah. All right, so let's go back to how you opened your argument. I'm looking at the deposition that you cited me to. And I'm going off of your characterization, which I challenged you on, that he did not walk up to the office and call him a fucking racist. And you cite me to his deposition testimony. So I'm reading from page ER21. ER21? Right. And I won't go for the full answer here. I guess it was you asking the question? Yes. What did you say to him? And there's a very lengthy answer before he says, and he got mad. And basically he was, you know, saying, well, take it off or go home. And I was like, man, you just a racist then. I was looking at him in his face, and I was like, man, you're a racist. Didn't you say you're a fucking racist? Answer. That's when we was in his office, okay? So after I said, you're a racist, I walked out of his office. Wayne came from, he was sitting down, he came from behind his desk, and he followed me out of the office, you know, and he, what did he say? He said, why don't you just quit? That's when he said to me, as I was going, as I was leaving his office, and I said, I'm not going to quit, you know, I can't remember. He said, why don't you just quit? And I was blocking everything he was saying. I was like, you're a fucking racist. I stand corrected, Your Honor. I didn't mean to mischaracterize that. It was my opening, and that is what I was referring to. Yeah. Okay. So in substance, he went up to the HR director's office. He wanted to keep the T-shirt on. HR director said no. He's walking out of the office. He says, man, you're a racist. HR director comes out. We've got the deposition. And then several times he says that out there in the work area where others were present. Now, for Judge King to have granted summary judgment here, he had to find that there were no material facts in dispute. Is that correct? That's correct. How could he do that here? Well, because if we're talking about the final incident, it's undisputed that what happened is that he called the director of HR a fucking racist several times outside the office, but it's undisputed that's what happened. He did it in a voice loud enough to drown out the HR director. He said it several times. Then he had an opportunity to calm down. He goes down to the lunch area, and this is from his statement of March 13th, Mr. Presley's statement. He goes down to the lunch area, sees his supervisor, Mr. Elson, who says to him to calm down. He then goes to his work area, and he goes back near the lunch area where he confronts the senior manager of the whole facility and essentially engages in very similar misconduct, although it doesn't call him fucking racist, calls him a racist. All of that, Your Honor, is undisputed. Moreover, what's undisputed is the pattern of misconduct that happened prior to that, the fact that he had been fired once before, suspended twice before, on a last chance agreement, was required to enroll in anger management. All of these are undisputed facts. Short-term employee, lots of disciplinary problems, and it was against that backdrop that you had the T-shirt incident. I mean, an employer has to be able to fire an employee who comes in and says that sort of thing, particularly with that kind of background and pattern of very similar misconduct. Do you think there's enough here for a mixed motive instruction? No. But that decision isn't made until you're in trial. That's my understanding, is that's a jury instruction question. Okay, thank you. Thank you, Your Honor. You have about a minute left. Thank you, Your Honor. I think Mr. Kish's response to the question about the words fucking racist shows us why the jury should hear this case. He said it depends on the facts. Is it loud? What's the context? That's exactly the point. The facts are in dispute. He just got through telling me at the end there, on that day that he was fired, that they weren't in dispute. They are in dispute. They claim that he was loud. He says he wasn't. They claim that other people overheard it, but they didn't produce anyone who overheard him say, you're a fucking racist. Nowhere in the record is there anyone who comes up and says, yeah, I heard him, except for Mr. LaRochelle. But he does admit he said it repeatedly. So it's not just a statement of fact. He did. And the way he described it in his... Expression of anger, right? The way he described it in his deposition, and you couldn't see his gesture in the record as he said, put my hands up to my ears, and I repeated it so I couldn't listen to him. Mr. LaRochelle is telling him, why don't you just quit? He's following him out the office. He's antagonizing Mr. Presley. Mr. Kiss also referred to the pattern of the prior months, and the facts are in dispute about what that pattern was. They want to say, here's a guy who's disruptive, and we disciplined him. We gave him a last chance agreement and an anger management counseling. What was going on here is a man who is under the vice of racism as far as he sees it, and if you put someone under a vice and keep turning it on them, they're going to cry out in pain. So if Mr. Presley expressed frustration about the situation, it was in response to the treatment that he felt he was experiencing. Thank you. The case is signed. Mr. Hance, a minute.
judges: Kozinski, Fisher, Paez